# THE STATE v. ARTHUR BROWN, Appellant.

## Division Two, February 19, 1913.

1. **EVIDENCE: Statements Out of Court: Bolstering up Testimony: Improper Hearsay: Harmless.** Testimony that a witness on other occasions made statements similar to what he has testified is not, as a general rule, admissible on re-direct examination, since it is ordinarily incompetent for a witness to corroborate his own testimony by showing that on former occasions outside of court his statements were the same as those testified; and where the questions on cross-examination were carried no further than an inquiry of the witness if he had talked over the facts of the homicide with the prosecuting attorney and certain police officers, the prosecuting attorney was not authorized on re-direct examination to ask the witness if he had ever at any time made a different statement to any of those officers or any one else. But the error is only technical, and under the circumstances of this case was not prejudicial.

2. **ALIBI: Instruction.** An instruction telling the jury that "if there is any evidence before you that raises in your minds a reasonable doubt as to the presence of the defendant at the time

and place where the crime is charged to have been committed, you will acquit the defendant," in unmistakable language tells the jury the necessary elements of an *alibi*.

3. ARGUMENT TO JURY: Not Assigned in Brief: Considered Nevertheless. Although the remarks of the prosecuting attorney in his opening argument to the jury are not urged in defendant's brief, yet, being properly preserved in the record, they are nevertheless considered in this case.

4. ————: Murder for Money. Where a man entered the office where deceased was at work and where it was generally known that money was daily received and was frequently seen lying on deceased's desk, and with pistol drawn ordered the employees to get quickly into a vault and before deceased could do so, shot him, it was not error for the prosecuting attorney to tell the jury it was a "murder for money; it was for blood money."

5. ————: Discrediting Defendant's Main Witness: Should Be In Dock. In his closing argument to the jury, in a case of murder, where the defense was *alibi*, the prosecuting attorney said that defendant's main witness "deserves to be in the dock with the defendant in this case. I say it is in the evidence in this case." There was no evidence to sustain the remark. Defendant's counsel objected that "there is no evidence in the case to warrant it;" whereupon the court said, "Do not argue it; you have argued the case once." *Held*, that to discredit the witness's testimony was to practically destroy the defense, and that such cannot be done in the absence of testimony. The remark was prejudicial, tending to inflame the minds of the jury against the witness and to cause them to give little or no credence to his testimony; and the remarks of the court had a tendency to aggravate rather than to lessen its prejudicial effect.

6. ————: No General Rule. It is difficult to formulate a general rule defining the limit to which prosecuting attorneys may go in their arguments to juries. The extent of the prejudice caused by them must be measured by the facts of each case.

Appeal from Jackson Criminal Court.—*Hon. Ralph S. Latshaw*, Judge.

REVERSED AND REMANDED.

*Cameron L. Orr* and *Horace S. Kimbrell* for appellant.

(1) The court erred in permitting the State to prove by witnesses Pulhamus and Brown that they

made repeated statements outside of court similar to the statements made in court under oath. State v. Brown, 17 Mich. 435; DeShon v. Ins. Co., Metc. 199; 1 Greenleaf, Ev., sec. 469; Starkey, Ev., p. 187; Rix v. Parker, 3 Doug. 242; Berkley—Peerage case, 2 Phil. Ev. (4 Ed.) Cowen and Hill's Notes, p. 974, note 2; Robb v. Hockley, 23 Wend. 50; 2 Russell Cr. 938-9, 763; 5 Cow. 314; State v. Taylor, 134 Mo. 154. (2) Under the facts of this case, the instruction given on *alibi* is confusing, misleading and ambiguous. Defendant, according to his own admissions, was at the place—if "place" be a term broad enough to take in the Missouri Pacific freight house and grounds—and in this sense he was there at the time also. Defendant denies he was in the cashier's office at the time of the shooting. State v. Bateman, 196 Mo. 39; State v. Taylor, 118 Mo. 153; State v. Harvey, 131 Mo. 339. (3) The court erred in failing to rebuke the prosecuting attorney for arguing to the jury that Lafe Fowler, defendant's chief witness, upon whose evidence he relied to establish his innocence, was himself a party to the murder of Arthur Underwood, and was so guilty under the evidence, that he should be a prisoner in the "dock" on trial for his life, instead of being recognized as a reputable witness, whose testimony the jury should fairly consider in determining the guilt or innocence of defendant. The court erred in giving this judicial sanction by saying in the presence of the jury, "I see nothing objectionable to it." State v. Wana, 245 Mo. 558; State v. Ulrich, 110 Mo. 350; Cameron v. Cameron, 162 Mo. App. 110.

*Elliott W. Major,* Attorney-General, and *Ernest A. Green,* Assistant Attorney-General, for the State.

(1) Instruction 8, with reference to *alibi,* has repeatedly met with the sanction of this court. State v. Williams, 141 Mo. 321. (2) Under the testimony

in the case and the facts as brought forth from the witnesses, neither of the statements made by the assistant prosecuting attorneys were anything more or less than legitimate arguments of the testimony in the case.   No serious objection can be urged against either of the statements.   In order to justify a reversal of a judgment in a criminal case because of improper remarks by an attorney for the State, it should appear to the court that the remarks complained of were prejudicial to defendant, and probably had something to do in bringing about the verdict reached by the jury.   State v. Hibler, 149 Mo. 484.

WALKER, J.—The prosecuting attorney of Jackson county, on December 20, 1911, filed an information in the criminal court of that county, charging the defendant with murder in the first degree, in the shooting and killing of Albert Underwood on December 1, 1911.   At the January term, 1912, of said court, the defendant was tried, found guilty of murder in the first degree, and his punishment assessed at death.   Timely motions for a new trial and in arrest of judgment were filed and overruled, and an appeal has been perfected to this court.

*Murder in First Degree.*

The facts disclosed by the evidence are as follows:

Albert Underwood, the deceased, was employed in the auditing department of the Missouri-Pacific Railway Company at its freight offices in the West Bottoms in Kansas City, Missouri. His particular duties were to receive collections, in the cashier's office of the said department, on account of freight.   The cashier's office was on the first floor of a three-story building, the entrance to same from the street being through a general hallway in which there were stairs leading to the upper floors.   About twenty-five feet from this main entrance a door opens

*Statement.*

into the cashier's office where Underwood was employed, his desk being located in the southeast corner of the office to the right of the cashier's window. At the time of the killing, a young man named Barnes was at work at a desk in the opposite corner to the right of where Underwood was employed; to the left of Barnes was a desk occupied by a man named Proctor, and behind the door which entered the room from the main hallway and near the corner, was another desk occupied by a man named Pulhamus. Just in the rear of Underwood's desk was another occupied by a man named Brown, and near Brown's desk Clayton, another employee of the railroad, was standing.

At about 5:40 o'clock on the evening of December 1, 1911, the door of the cashier's office leading from the main hall was opened, and one of the witnesses present states that three negro men entered, two of them stopped just inside the door, and that the third, who was the only one seen by the other witnesses, was the defendant. He walked into the room behind the chair where Barnes was sitting, and with a revolver in hand said to Barnes, "Get into the vault, and be quick about it." The vault referred to was adjacent to the cashier's office. The defendant then shot at Barnes and the bullet grazed his neck, passing through the right sleeve of his shirt. Defendant then struck Barnes as he was rising from his chair, and felled him to the floor. Turning to Pulhamus, who was partially behind the door, and pointing his pistol at him, defendant ordered him to get back into the vault. Pulhamus did so, backing towards the vault. While this was occurring, Underwood, the decased, was standing near his desk where he had been checking off freight receipts. The defendant then pointed his pistol at Underwood, saying, "Damn it, get back into the vault." Almost simultaneously with this command the defendant fired the pistol, striking Underwood in one of his hands. Underwood ex-

claimed, "For God's sake give me time to get into the vault!" With that the defendant shot again, striking and mortally wounding Underwood, who staggered out of the room into the vault. Of the persons employed with Underwood at the time of the shooting, the defendant was identified by Barnes, Pulhamus, Brown and Clayton. In addition to Underwood, these were all of the persons in the room at the time, except one Proctor, who stated he was so frightened he did not stop to take a look at the man who was doing the shooting, but got out of the room as soon as he could after the trouble began.

At the time defendant entered the room, there were lying around on the cashier's desk several hundred dollars in money and checks. Defendant had previously been employed in the same building, was familiar with the location and arrangement of the offices and where the money was kept.

Immediately after the shooting, defendant tried to get out of one of the windows, but failing in this turned and ran out of the door. In addition to those who witnessed the killing, and identified defendant, he is also identified by W. R. Lentz, the local agent of the railway company, who states that while he was in his office on the second floor of the same building in which Underwood was killed at about 5:40 p. m. a young man rushed in saying that "the cashier's office was being held up and robbed;" that witness rushed out of his office and ran down stairs when he saw a negro man running through the hall towards the front door; that witness saw defendant at the police station on the following Monday and identified him as the man he saw running through the hall; that witness went, immediately after seeing the man run through the hall, to the cashier's office and found Underwood shot and his associate employees attempting to hold him up to keep him from falling on the floor; that witness called a physician and an ambu-

lance and subsequently Underwood was carried out on a stretcher, put in the ambulance and conveyed to a hospital.

Vincent Kennedy, a clerk employed in one of the offices in the same building in which Underwood was killed, while sitting in his employer's office, heard two or three shots fired; he ran to the door and partially opened same, and saw a negro man coming out of the door of the cashier's office. When the man came within four or five feet of witness, the latter saw that he had a pistol in his right hand and something in his left; that upon the man's seeing the witness, the former said, "Step back, you son-of-a-bitch, and don't move;" that the witness had a fair opportunity at that time to see the man and identifies him as the defendant now on trial.

A boy named Ward, also employed at the building where the killing occurred, testified that a few minutes before the shooting he saw defendant in the building and had a conversation with him. Another witness named Oscar Underwood stated that a few minutes after the time testified to by Ward he saw the defendant and a janitor named Powell talking to each other in whispers in the toilet room at the end of the floor on which the cashier's office was located.

Defendant's principal witnesses to establish an *alibi*—which was the substantial defense in the case —are himself and a negro man named Lafe Fowler.

The substance of defendant's testimony is that on the evening Underwood was shot, at 5:20 or 5:25 o'clock, defendant went to a building near the one in which the shooting occurred, to collect a small sum of money due him from the janitor named Featherstone Powell. Failing to accomplish the purpose of his visit defendant said to Powell, "I am going over to Lafe Fowler's," the latter being the janitor employed in what was known as the Superintendent's Building,

247 Mo.—46

which was near the one in which the shooting occurred; that Powell replied, "Go over and wait and I will come by and pay you your money." Defendant said, "All right," and started at once to Fowler's; that it was about 5:30 o'clock, or possibly a few minutes later when he reached Fowler, remaining with the latter in a room on the second floor until 6 o'clock, when they left the Superintendent's Building together. On their way out they passed two men engaged in conversation at the head of the stairs and Fowler spoke pleasantly to them. Upon reaching the front door of the Superintendent's Building they saw an ambulance before the door of the building in which the killing occurred, and the body of a man being brought out of the building and placed in the ambulance, when it was driven away. Among others gathered about the ambulance defendant recognized Frank Wall, chief delivery clerk of the railway company, and immediately thereafter he and Fowler went to the eating house of a woman named Hattie Bell, where Fowler had been taking his meals, and that defendant waited for him but did not eat, saying that his mother would be expecting him for supper. That after Fowler had finished his meal, he and defendant went to Kansas City, Kansas, where they resided.

Lafe Fowler, a witness for the defendant, testified that he had been employed as a janitor in the Superintendent's Building for nine years; that he had known the defendant eight years; that defendant came to Fowler's room in the Superintendent's Building at about 5:30 or 5:35 o'clock on the evening the killing occurred; that Fowler was shining his own shoes when defendant came in, and after some common place talk, during which time Fowler was preparing, by changing his clothes, to quit work for the day, they left the building together at about 6 o'clock. As they went down the stairway they saw two men, a Mr. Hubbard and Mr. Daniels, employees of the

railway company, standing engaged in conversation near the top of the stairway; that witness addressed them, saying, "Good evening, gentlemen," to which they responded, "Good evening." When witness and defendant went out of the Superintendent's Building, they saw a man named Robert Benson, a clerk for the railway company, standing near the outside door on the steps, and an ambulance backed up to the curb before the building in which the shooting occurred and the body of a man being brought out and placed in the ambulance; witness said to Benson, "What's up?" to which Benson replied, "I don't know, Lafe." Seeing a number of persons gathered around the ambulance, they went over there, when it was driven away and the crowd begun to disperse. Just at this juncture, witness says he asked Eugene LaRue, who was standing near by and was an accountant for the railway company, "what was going on." LaRue's answer is not shown by the record. Witness further says that just as he and the defendant were starting away, he saw Frank Wall, another railway clerk, who said to them, "What are you doing and where are you going?" to which witness replied, "We're going down west, down St. Louis avenue;" that Wall walked a short distance with them, engaged in conversation in regard to the shooting, and that witness and defendant then went down to the eating house of Mrs. Bell, where the witness took his meals, and Wall went towards Liberty street. That the witness ate his supper at Mrs. Bell's, and the defendant waited for him, after which they went to Kansas City, Kansas, where both resided; that witness was with defendant continuously from the time they met in the Superintendent's Building at 5:30 p. m. until they parted for the night at Kansas City, Kansas.

Richard Beeson, a clerk of the railway company, says that on the evening of the shooting, sometime

after five o'clock, Lafe Fowler shined his, Beeson's shoes, in the latter's office in the Superintendent's Building.

Robert Benson, another clerk who was employed in the Superintendent's Building, says that on the evening of the shooting at about six o'clock he saw Lafe Fowler and another negro man come out of the Superintendent's Building where Lafe was employed; that when they came out an ambulance had been driven up before the building in which Underwood was shot. Witness positively recognizes Fowler as one of the men he saw, but says he paid no particular attention to the other.

Eugene LaRue, a railway accountant, saw Lafe Fowler and another negro man in front of the Superintendent's Building just as Underwood was being brought out to the ambulance but that he did not know who the man with Fowler was.

Frank Wall, chief railway clerk for the railway company, saw Lafe Fowler and another negro man a short time after Underwood's body had been brought out and placed in the ambulance. The two were walking along, going north. Witness walked with them some distance and among other things asked them which way they were going. They said, "towards the State line." Witness left them, going westwardly. The man with Fowler was the defendant, whom witness now sees in the court room.

Earl M. Daniels, an employee of the railway company, states that on December 1, 1911, at about six o'clock the evening of the shooting, he and another clerk named Hubbard were engaged in conversation at the head or top of the stairs in the Superintendent's Building, when Lafe Fowler and another negro man passed them, going out. As they passed, Fowler said, "Good night," which was his usual manner when leaving the building for the day. Witness does not know who the other man was.

W. W. Cooke, a former chief of police of Kansas City, Kansas, testified that the defendant's reputation as a peaceable, law-abiding man was good.

John J. Dillon, a police officer of Kansas City, Missouri, testified that defendant's reputation for general morality was bad and that at the time of his arrest defendant said, "I know what you are picking me up for—that Missouri Pacific stick-up."

**Assignments.** The errors assigned by defendant for a reversal of the judgment are: .

1st. That the court permitted the State to prove by witnesses Pulhamus and Brown that they had repeatedly made statements outside of court similar to their testimony under oath.

2d. That the instruction on *alibi* was confusing, misleading and ambiguous.

3d. That the prosecuting attorney was permitted in his closing argument to the jury to state "that Fowler [defendant's principal witness] deserves to be in the prisoner's dock with the defendant."

I. The first ground of error urged by defendant is in regard to the admissibility of the testimony of **Statements Outside of Court.** the witnesses Pulhamus and Brown on behalf of the State in answer to questions propounded to them by the prosecuting attorney as to former statements made by them.

On cross-examination the witness Pulhamus was asked:

"Q. How many times have you talked this matter over with Mr. Boultt? A. I cannot say how many times. Q. A number of times? A. A number of times, yes, sir. Q. Also with Captain Stone and Raftery? A. Yes, sir."

On re-examination by the prosecuting attorney the witness was asked: "Q. Mr. Pulhamus, just one question. Counsel asked you if you had talked this matter over with Mr. Boultt and with officers Raftery

and Stone, and you answered, yes, sir. A. Yes, sir. Q. You also talked that matter over several times with me? A. Yes, sir. Q. Have you at any time to any of these gentlemen to me or to anybody else, given any statement of the facts in this matter within your knowledge other than you have stated here to this jury?

"Mr. Orr (counsel for defendant): We object to that as argumentative and a cross-examination of his own witness.

"The Court: In view of your examination I will overrule the objection.

"Exception.

"Q. Have you at any time in your conversation with Mr. Boultt or with Captain Stone or Mr. Raftery, or myself, or anybody else, stated facts about this tragedy and what you saw and observed other than you have stated to this jury? A. Do you mean any statement? Q. Have you made any different statement, stated any different from what you stated to this jury? A. No, sir."

The cross-examination of the witness Brown and his re-examination by the prosecuting attorney was practically the same as that of Pulhamus, to which like objection and exception were saved.

As a general rule, testimony that a witness has on other occasions made statements similar to what he has testified to in the case, is not admissible. It is only where it is evident that the witness is endeavoring to misrepresent the facts by reasons of his relation to the party or the cause that it is proper to show he has made similar statements before that relation existed. [State v. Taylor, 134 Mo. l. c. 155.]

It is only where a witness is assailed on the ground that he has stated the facts differently on former occasions that he may be asked to give the circumstances under which the statements were made, it being ordinarily incompetent for him to corroborate

his own testimony by showing that on other occasions
his statements were in harmony with those made on
the trial. [Whar. Crim. Evid. (9 Ed.), sec. 492.]

The only question asked the witnesses on cross-
examination was whether they had talked over the
matter with certain parties named, and the inquiry
was carried no further. This did not authorize the
prosecuting attorney on re-examination to ask them if
they had ever made any other than similar statements
to those made on the trial. "It was bolstering up his
statement in court by proof of a like statement out of
court; and it was therefore open to all the objections
to which hearsay evidence is usually subject." [Brown
v. People, 17 Mich. l. c. 435.]

While the admission of this testimony was tech-
nical error, in view of the particular facts in this case,
namely, that Pulhamus and Brown had been fully cor-
roborated by several other witnesses as to their testi-
mony in regard to the killing and their identification,
of the defendant at the scene of the tragedy, reversi-
ble error was not committed in the admission of the
testimony complained of because the defendant was
not thereby injured, and we rule this point against the
defendant.

II. The instruction on *alibi* complained of by the
defendant is in the following language:

"The court instructs the jury that if there is any
evidence before you that raises in your minds a rea-
sonable doubt as to the presence of the de-
**Alibi.**    fendant at the time and place where the crime
is charged to have been committed (if you find a crime
was committed) you will acquit the defendant."

An instruction in these same words has been ap-
proved in State v. Davis, 186 Mo. l. c. 539, in which
GANTT, J., speaking for the court, says: "This in-
struction was approved in State v. Adair, 160 Mo.
391, and while in State v. McGinnis, 158 Mo. 123, a

different form was indicated as proper, it was not ruled that the same principle might not be expressed in fewer words or in different form." In a later case this court has approved an instruction on *alibi* in the following words: "Unless you find and believe from all the facts and circumstances given in evidence the presence of defendant at the place of the alleged murder, and his guilt beyond a reasonable doubt, you should acquit him." [State v. Shelton, 223 Mo. 118, l. c. 137.]

The principle to be deduced from the foregoing cases and many others is that the purpose of an instruction in regard to an *alibi* where that defense is interposed, is that the jury may be told in plain terms that, if upon a full consideration of all the evidence in the cause, they entertain a reasonable doubt of the presence of the defendant at the time and place of the alleged commission of the offense, they should acquit him.

The instruction complained of does this in an unmistakable manner and we rule this point against the defendant.

III.  Defendant complains of certain remarks of the prosecuting attorney in the opening and closing arguments to the jury.

Argument to Jury.  The remarks in the opening argument are not urged in defendant's brief, but are properly preserved in the record and should be considered.

The remarks in the opening argument were: "Gentlemen of the jury, this is a murder for money." And in saying later, in the same argument, in referring to the killing of Underwood: "It was for money. It was for blood money." And in declaring in his closing argument, in a review of the testimony of Lafe Fowler, the principal witness for the defendant: "I tell you that that man Fowler deserves to

be in the dock with the defendant. I say it is in the evidence in this case."

When the remark in the closing argument was made the following occurred:

Counsel for Defendant: "I suppose that all of this is objected to."

The Court: "Nothing objected to unless you object to it."

Counsel for Defendant: "I object to the statement with reference to Fowler. There is no evidence in this case to warrant it."

The Court: "Don't argue it, you have argued the case once."

Counsel for Defendant: "Is it overruled?"

The Court: "You have argued your case once. Objection overruled."·

Counsel for Defendant: "I beg your pardon. Exception."

In regard to the remarks made in the opening argument the inference may be permissible that the killing was for money, no other motive being shown, because it seems to have been generally known that the office where it occurred received money daily, and that it was frequently seen lying on the receiving clerk Underwood's desk, and that a number of bills was lying on this desk at the time of the killing.

The remark of the counsel for the State in his closing argument that the witness Fowler deserved to be in the dock with the defendant, in the absence of any testimony to sustain it, and there was none, could not under the facts in this case have proved otherwise than prejudicial, in tending to inflame the minds of the jury against Fowler and in causing them to give little or no credence to his testimony. The defense was an *alibi*. Fowler was the only witness aside from the defendant himself who testified unequivocally to defendant's presence elsewhere at the time of the tragedy. To discredit Fowler's testimony was to

practically destroy the defense; this cannot be done in the absence of testimony.

The language of the court in overruling counsel for defendant's objection to the closing remark had a tendency to aggravate rather than lessen its prejudicial effect. Instead of ruling directly upon the objection, the court said: "Don't argue it, you have argued the case once;" and upon inquiry by counsel for the defense as to the ruling, said further: "You have argued your case once. Objection overruled." This language reasonably construed, impliedly sanctioned the correctness of the remark objected to, when such remark was without foundation in the evidence.

It is difficult to formulate a general rule defining the limit to which prosecuting attorneys may go in their arguments to juries, and analogous cases afford little aid in this regard. The extent of the prejudice aroused in the minds of the jury by such remarks must, therefore, be measured by the facts in each particular case. Applying this test to the case at bar, we are of the opinion that the remark of the prosecuting attorney in his closing argument was of such a nature as to inflame the minds of the jury to the extent that they could not render a fair and impartial verdict under the evidence, and we rule this point in defendant's favor.

Entertaining these views, the judgment of the trial court should be reversed and the cause remanded, and it is so ordered. *Brown, P. J.*, and *Faris, J.*, concur.